UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEFFREY FOWLER, PAUL WHOOTEN, MICHAEL TURNER, and MICHAEL FITZPATRICK on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS TURCO, Commissioner of Massachusetts Department of Correction, in his official capacity, and MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL HEALTHCARE, INC.,<br><br>Defendants. | C.A. NO. 1:15CV12298-NMG |

## MEMORANDUM IN SUPPORT OF JOINT MOTION TO APPROVE SETTLEMENT

### I.    INTRODUCTION

Plaintiffs and Defendant Thomas Turco submit this memorandum of law in support of the parties' Joint Motion to Approve Settlement.  The settlement is fair, reasonable, and adequate, and it should be approved pursuant to Fed. R. Civ. P. 23(e).

The terms of the settlement are set forth in the Settlement Agreement (Exhibit 1 to the Motion), including the first exhibit thereto, a new Clinical Guidance to be implemented for the evaluation and management of Hepatitis C.  The DOC (via Defendant Turco) has agreed to arrange for its contracted medical provider to implement this new Clinical Guidance and its provisions regarding Hepatitis C screening, staging, and treatment.

Plaintiffs and Defendant Turco submit that this settlement is desirable to avoid the time, expense, and inherent uncertainties of continuing this litigation, and in order to finally and

completely resolve all remaining issues relating to this lawsuit.  The Settlement Agreement is the product of arms-length negotiations and is substantively fair and reasonable, and is in the best interests of the Plaintiff Class.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed the Complaint on June 10, 2015, challenging the adequacy of Hepatitis C treatment for DOC prisoners.  Plaintiffs contend that the DOC and its contracted medical provider, Defendant Massachusetts Partnership for Correctional Healthcare, LLC ("MPCH"), were not treating prisoners with new, highly effective direct acting antiviral ("DAA") medications, in violation of the Eighth Amendment to the United States Constitution.  Plaintiffs also contend that the Defendants were failing to adequately monitor the progression of disease in Hepatitis C patients, and to screen new prisoners for Hepatitis C.  Defendants deny violating the constitutional rights of these prisoners.

Early in the case, the parties pursued settlement, but negotiations were not fruitful at that time.  On July 25, 2016, this Court certified a Plaintiff class of all current and future DOC prisoners who have or will have Hepatitis C.  The parties then pursued discovery, which was complicated by the large number of DOC prisoners with Hepatitis C (estimated to range from 1,200 – 1,800 prisoners at different points in time), the need to provide pre-production notice and an opportunity to object to former class members (released prisoners and the families of deceased prisoners), and the sizable amount of electronically stored information that needed to be reviewed and produced by Defendants.

On December 6, 2017, the Parties requested a stay of this case, as settlement negotiations had resumed and were more promising.  On February 9, 2018, the parties reported having agreed to

2

terms of a settlement.  The executed Settlement Agreement is attached to the motion being filed

herewith.

### III.        SUMMARY OF THE SETTLEMENT TERMS

Under the terms of this Settlement Agreement, the DOC will arrange for its medical

contractor to implement new Clinical Guidance for the evaluation and treatment of Hepatitis C in

prisoners.  The Clinical Guidance, Exhibit A to the Settlement Agreement, is a comprehensive

protocol that will result in more patients being treated and clear guidelines for the evaluation,

staging, and tracking of patients with Hepatitis C.  To start with, all new prisoners will be offered

testing for the Hepatitis C virus upon entering DOC custody, as will any prisoner with specific risk

factors set forth in the Guidance, and any prisoner who requests testing.  Clinical Guidance at 5-6.

Those prisoners whose testing indicates that they have Hepatitis C will receive a baseline

clinical evaluation within two months of that testing.  The baseline evaluation includes a thorough

examination for signs of liver disease or other manifestations of Hepatitis C, and a set of laboratory

tests from which the DOC's medical contractor (currently MPCH) will be able to assess the

patient's liver fibrosis level.  Clinical Guidance at 6-7.  The fibrosis level, however it is measured, is

commonly interpreted on a scale running from stage F0 (little or no evidence of fibrosis) to stage F4

(cirrhosis of the liver).  The baseline lab tests will include calculation of two scores, APRI and FIB-

4, each of which is a staging test, *i.e.* it assesses the degree of liver fibrosis; any other staging test

already in the patient's record will also be considered.  More sensitive staging tests can be ordered

as well, but they will not include liver biopsies except in unusual circumstances.  Clinical Guidance

at 8.

Within one month of the initial baseline evaluation, a Hepatitis C patient will be assigned to

a priority level based on her staging test results or other factors.  *Id.* at 14.  The priority levels are:

- **Priority Level 1**:  Advanced liver fibrosis or cirrhosis (stage F3 or F4), and patients with certain high-risk conditions (including certain cancers);

- **Priority Level 2**:  Moderate liver fibrosis (stage F2 or above), as well as co-infection with HIV or Hepatitis B, chronic kidney disease, diabetes, or other liver diseases; and

- **Priority Level 3**:  Stage F0 – F1 liver fibrosis.

Clinical Guidance at 11-13.

A patient's priority level determines whether and how soon he will be treated for Hepatitis C.  Pursuant to the Settlement Agreement, the DOC shall ensure that every known class member is assigned to a priority level.  Settlement Agreement at ¶ 24.  Those class members in Priority Level 1 shall be treated within 12 months of preliminary approval with direct-acting antivirals (DAAs), the newest class of Hepatitis C medications, which are highly effective and cause very few side effects. *Id.* at ¶ 25.  Those class members in Priority Level 2 will be treated with DAAs within 18 months of preliminary approval.  *Id.* at ¶ 26.  Approximately 280 prisoners are expected to fall into those priority levels and be treated within 18 months.  *Id.* at ¶ 32.

During that 18-month period after preliminary approval, class members who were assigned to Priority Level 3 may have additional staging tests that result in their being assigned to Priority Level 1 or 2.  Similarly, new prisoners with Hepatitis C will arrive in DOC, some of whom will be assigned to Priority Level 1 or 2.  For these prisoners, those in Priority Level 1 will be treated within 9 months of being assigned to that level, and Priority Level 2 patients will be treated within 12 months.  *Id.* at ¶¶ 27-28.

At the end of the 18-month period following preliminary approval, existing or new DOC prisoners with Hepatitis C who are assigned to Priority Level 1 or 2 will be treated within 3 months (Priority Level 1), or 6 months or 12 months (Priority Level 2, with distinctions made based on staging test results) of being assigned to that level.  *Id.* at ¶¶ 29-31.

Patients assigned to Priority Level 3 are not prescribed treatment within any particular time frame.  However, they will have an examination and new laboratory tests performed every 6 months.  Clinical Guidance at 17.  If those test results show progression of liver fibrosis to F2 or higher, or if other qualifying conditions present themselves, these prisoners will be reassigned to Priority Level 1 or 2 and will be scheduled for treatment.

The aforementioned time frames for staging, assignment to priority level, and treatment mark a significant departure from previous Hepatitis C treatment protocols, which did not systematically guarantee treatment on any specified schedule.  Similarly, the Clinical Guidance narrows the circumstances in which a patient otherwise qualified for treatment could nevertheless be denied treatment.  Clinical Guidance at 13-14.  Most notably, a prisoner cannot be denied treatment for receiving a disciplinary report or other general allegations of misbehavior; a prisoner cannot be denied treatment based on evidence of drug use, unless it is IV drug use (and even then it is not an automatic exclusion, but a case-by-case assessment); and a prisoner close to her release date, who may not have time to complete the full course of treatment while in prison, may not automatically be excluded from treatment.  *Id.*

Under the Settlement Agreement, the DOC will hire a third party entity to monitor the implementation of the Clinical Guidance.  Settlement Agreement at ¶ 34.  That third party will conduct chart reviews every six months of at least 10% of all Hepatitis C patients to review

adherence with the Clinical Guidance, from patient  screening and baseline testing through post-treatment monitoring.  Additionally, the third party entity will monitor the implementation of the Clinical Guidance Protocol by conducting a concurrent chart review of at least 100 identified patients within the first 6 months of DOC's entering into an agreement with the monitor.  *Id.* at ¶¶ 35-36.  The third party entity will evaluate whether the DOC's medical contractor is following the requirements of the Clinical Guidance and will issue reports concerning same.  *Id.* at ¶ 37.

While the third party entity reviews compliance with the Clinical Guidance, the DOC will provide Plaintiffs' counsel with reports every three months from which it can be determined whether the time frames for treatment of Priority Level 1 and 2 prisoners, set forth in the Settlement Agreement, are being honored.  *Id.* at ¶ 41.

The Settlement Agreement calls for the Plaintiffs to voluntarily dismiss MPCH from the action upon final approval of the settlement by this Court.  *Id.* at ¶ 55.  The settlement term is 30 months from final approval, during which the parties request that the court retain jurisdiction to address any allegations of material non-compliance with the Settlement Agreement.  *Id.* at ¶¶ 49-54.

## IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.  Standards for Approval of Settlement

Rule 23(e) of the Federal Rules of Civil Procedure provides, in part, that the claims of a certified class can only be settled with the court's approval.  To grant approval of a settlement, the court must determine that it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2)*; see also* 4 Newberg on Class Actions § 11:41; 2 McLaughlin on Class Actions § 6:7.

The Court's review is conducted against the backdrop of the strong judicial policy favoring settlement of class actions.  *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 68

(D. Mass. 2005); *In re Lupron Mktg. and Sales Practices Litig.,* 228 F.R.D. 75, 88 (D. Mass. 2005); *U.S. v. Cannons Engineering Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) ("there is an overriding public interest in settling and quieting litigation," and this is "particularly true in class action suits").  Even more, a trial court enjoys considerable discretion in approving a class action settlement, given the generality of the standard and the need to balance benefits and costs. *National Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund*, 582 F.3d 30, 45 (1st Cir. 2009).

### B.  The Settlement Resulted from Arm's Length Negotiations

There is an initial presumption that a proposed settlement is fair and reasonable when it is the result of arm's length negotiations by experienced counsel after discovery.  *See M. Berenson Co. v. Faneuil Hall Marketplace*, Inc., 671 F. Supp, 819, 822 (D. Mass. 1987) ("Where, as here, a proposed class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair.") (internal footnote omitted); *In re Minolta Camera Products Antitrust Litig.*, 668 F.Supp. 456, 460 (D. Md. 1987); *see also* 4 Newberg § 11:41.

Here, Plaintiffs and the DOC engaged in extensive settlement negotiations from the outset of the case.  When no agreement could be reached after the initial negotiations, the parties turned to discovery.  The exchange of written discovery and the production of documents were nearly complete when negotiations resumed in 2017.  At that point, all parties had the benefit of the information contained in tens of thousands of pages of documents concerning issues ranging from individual patient decisions, to summary statistics on the Hepatitis C population in the DOC, to the efficacy and cost of DAAs, to the protocols and practices being used to decide

7

which prisoners would be treated with DAAs.  With this discovery to inform their assessment of the case, Plaintiffs' and Defendant Turco's counsel were able to have more productive discussions, and ultimately reach a conclusion that the Settlement Agreement is worthy of the parties' and the Court's support.

### C.  The Settlement Provides a Significant Benefit to the Class

The Settlement Agreement and Clinical Guidance provide significant benefits to the class.  Most notably, they are designed to treat (and in nearly all cases cure) those DOC prisoners with advanced disease within a relatively short time and to treat other DOC prisoners with Hepatitis C before their disease becomes advanced.  Through its contractor MPCH, the DOC had been treating some Hepatitis C patients with DAA medications, but was not systematically treating all patients with moderate or severe liver fibrosis.  In the first three and a half years after the FDA approval of Sovaldi and Olysio, the first DAAs, from November 2013 to May 2017, approximately 130 prisoners were treated with DAAs.  In the first 18 months after preliminary approval of this settlement, the DOC projects to treat over twice as many prisoners.

In addition, the Settlement Agreement and Clinical Guidance provide a transparent look at how a Hepatitis C patient qualifies for treatment and how quickly she will be treated.  This detailed protocol, with defined time frames for staging and assigning patients to a priority level, changes the previous protocol, in which there were no such time frames and patients waited for decisions on whether to treat.  The Clinical Guidance clarifies that one APRI or FIB-4 score can qualify a patient for treatment and can do so at a lower threshold than previously used.  It also makes clear that where there are multiple staging test results in a patient's chart, the result indicating the highest degree of liver fibrosis is to be used.  Previously, a test suggesting a lower

degree of fibrosis could outweigh a higher test result, or could lead to additional staging tests being ordered.

The Clinical Guidance also places short deadlines on the DOC's medical provider to offer Hepatitis C testing to new prisoners (14 days), conduct a baseline clinical evaluation on those who test positive (two months), and assign prisoners to a priority level (one month). Prisoners with Hepatitis C will know very quickly where they stand.

The reduction in the number of treatment exclusions will also benefit the class. Under the Settlement Agreement, the decision whether to treat a patient with DAA medications must be based on clinical considerations only. For example, receipt of disciplinary reports will not be grounds for denying treatment. Time remaining on a patient's sentence will be taken into account for purposes of expediting pre-treatment assessment or creating a continuity of care plan if treatment will not be completed before the patient's release, but is not grounds for denying treatment. In addition, the Settlement Agreement prohibits discontinuation of treatment once treatment with DAA medications have begun, except for appropriate clinical reasons.

Universal opt-out testing of new DOC prisoners for Hepatitis C will help future class members become aware of their condition earlier. Such testing will also further public health by identifying new Hepatitis C cases and treating many of them.

For those class members who are not subject to the current treatment schedule, the Settlement Agreement calls for frequent reevaluation. With a new examination and set of laboratory tests every six months, these patients will not slip through the cracks. Liver disease progression will be detected earlier, and patients will be reassigned to Priority Level 1 or 2, putting them in line for treatment.

The Settlement Agreement provides the Plaintiff class with immediate, tangible benefits. Settling now also ensures that more class members will receive Hepatitis C treatment much sooner than if the issue were litigated and appealed.

### D.  The Attorneys' Fees and Expenses Are Reasonable

Plaintiffs' counsel are seeking reasonable attorneys' fees and costs in the amounts identified at Paragraph 43 of the Settlement Agreement, figures which DOC has agreed to pay in the spirit of compromise, and without taking a position on whether plaintiffs are prevailing parties for purposes of a fee award.   Settlement Agreement at ¶ 43.  As previously discussed, *supra* at Sec. IV(B), a settlement is presumed to be fair when the parties have bargained at arms length.  The fee award here results from good faith negotiations, and it reflects adjustments made by Plaintiffs' counsel to ensure that the amount is reasonable.  The reasonableness of the agreement as to attorneys' fees and costs is further supported by the Affidavit of Joel H. Thompson, dated February 26, 2018, attached hereto at Exhibit 1.  Moreover, this case does not involve a common fund out of which the fees and costs would be paid.  *See Stokes v. Saga Int'l Holidays, Ltd.,* 376 F.Supp.2d 86, 89 (D. Mass. 2005).  Therefore, Plaintiffs and DOC submit that the negotiated attorneys' fees and costs are reasonable and should be approved.

### E.  The Notice Plan is Reasonably Calculated to Inform Class Members of their Rights

The Settlement Agreement calls for a notice to be sent by mail directly to Class Members, and DOC will also cause notices to be posted in a common area at each DOC facility. Notice of a proposed settlement must be disseminated to the greatest practical extent, and it must be understandable and complete.  *See, e.g., Duhaime v. John Hancock Mut. Life Ins. Co.,* 177

10

F.R.D. 54, 61 (D. Mass. 1997).  The proposed plan meets this requirement.

The proposed notice gives class members until April 5, 2018 to submit comments about or objections to the settlement.  This approximately 45-day window should be sufficient time for class members to consider the settlement, learn more about its terms if they desire, and prepare any comments.

### F.  Proposed Enforcement of the Settlement by the Court is Reasonable

Plaintiffs and Defendant Turco propose that this Court retain jurisdiction over this case and act as the forum for deciding on disputes over alleged material non-compliance with the terms of the Settlement Agreement.  Settlement Agreement at ¶¶ 49-54.  The case would be dismissed at the end of the settlement term, 30 months from final approval, assuming no proceedings concerning alleged non-compliance are pending.  *Id.* at ¶¶ 52, 54.  Plaintiffs and Defendant Turco submit that the Court may retain jurisdiction over this matter notwithstanding the fact that it is a Settlement Agreement and not a consent decree being proposed, and that approval of this Settlement Agreement is fully consistent with the Prison Litigation Reform Act. *See Disability Law Center v. Mass. Dep't of Correction*, 960 F.Supp.2d 271, 283-86 (D. Mass 2012) (approving similar structure).

### V.  CONCLUSION

For the foregoing reasons, Plaintiffs and Defendant Turco request that the Court (1) preliminarily approve the settlement as set forth in the Settlement Agreement; (2) approve the class notice plan, including a deadline of April 19, 2018 for class members to submit comments or objections; (3) schedule a fairness hearing for the week of April 23, 2018; and (4) issue final approval of the settlement as set forth in the Settlement Agreement and exhibits attached thereto.

11

Respectfully submitted,

PLAINTIFFS JEFFREY FOWLER, PAUL
WHOOTEN, MICHAEL TURNER, AND
MICHAEL FITZPATRICK on behalf of
themselves and all others similarly situated,
By their attorneys,

/s/  Joel H. Thompson
Jonathan Shapiro, BBO #454220
jshapiro@swglegal.com
David Kelston, BBO #267310
dkelston@swglegal.com
Shapiro Weissberg & Garin
90 Canal Street
Boston, MA 02114
(617) 742-5800, ext. 115

Joel H. Thompson, BBO #662164
jthompson@plsma.org
Prisoners' Legal Services
10 Winthrop Square, 3rd Flr.
Boston, MA 02110
(617) 482-2773, ext. 102

DEFENDANT THOMAS TURCO,
As Commissioner of the Massachusetts
Department of Correction, in his official
capacity,

By his Attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Joel H. Thompson for Carrie Benedon
Carrie Benedon, BBO # 625058
Janna J. Hansen, BBO # 662063
Assistant Attorneys General
Government Bureau
One Ashburton Place
Boston, MA 02108
(617) 963-2080 (Benedon)

12

(617) 963-2812 (Hansen)
Carrie.Benedon@state.ma.us
Janna.Hansen@state.ma.us

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on March 9, 2018.

*/s/ Joel H. Thompson*